■ Jose Vargas, Appellant-Respondent, v American Export Lines, Inc., Respondent-Appellant and Third-Party Plaintiff-Appellant. Universal Maritime Service Corp., Third-Party Defendant-Respondent.—Judgment, Supreme Court, New York County (Helen Freedman, J.), entered June 28, 1988, which, *inter alia,* set aside the jury's $250,000 award for future lost earnings, discounted the jury's $165,000 award for future pain and suffering to $120,000, and granted the third-party defendant's motion to dismiss the third-party complaint, unanimously modified, on the law, the facts, and in the exercise of discretion, to the extent of reinstating the jury's award for future lost earnings in the amount of $250,000, reinstating the full amount of $165,000 which the jury awarded for future pain and suffering, reinstating the third-party complaint against third-party defendant-respondent, granting third-party plaintiff-appellant's motion to amend the third-party complaint to seek contribution and apportionment of fault and enter a judgment against the third-party defendant-respondent for 10% of the total damages awarded plaintiff, and otherwise affirmed without costs.

This appeal involves an action brought pursuant to general

maritime law, in which defendant sought indemnity from a third-party defendant. The underlying facts may be summarized as follows: On September 10, 1977 plaintiff Jose Vargas, an employee of A & G Maintenance Corp.,[1] was working as a lasher aboard the S. S. *Admiral William Callaghan (Callaghan)*, which was owned by defendant American Export Lines, Inc. (AEL). Vargas had been working as a lasher in tandem with his brother-in-law, Jose Roco, since 1973. As lashers, their job on the day in question was to unlash military vehicles which were being carried aboard the *Callaghan*, so that longshoremen in the employ of the third-party defendant, Universal Maritime Service Corp. (Universal), could then unload them from the vessel.

While Vargas was in the process of lashing a tank, a turnbuckle snapped, and his right knee was struck by the steel lever arm of the tensioner, whose safety lock was missing; the force of the blow knocked Vargas to the deck. Vargas was rushed to Bayonne Hospital, where it was determined that although there was no fracture, the X rays showed a "supra patella bursa effusion", i.e., the soft tissue above the patella was swollen and contained fluid.

The record reflects that Vargas' life before and after the accident on the *Callaghan* is a study in contrast. In the four-year period preceding the accident, Vargas never missed a single day of work due to physical problems. Although Vargas sustained a minor injury to his right knee while playing "football", i.e., soccer, approximately a year before the accident, this did not prevent him from working every day that work was available over the next year.

After the accident, Vargas was in constant need of medical attention. On some 75 to 80 occasions over the next 16 months he received diathermal treatments, cortisone injections, and had to have fluid drained from his knee. On January 4, 1979, Vargas was admitted to Brooklyn Hospital. A total meniscectomy was performed to remove the meniscus, which had been torn in the accident. While expert testimony indicated that the state of the art for this type of surgery would today result in surgery being performed with an arthroscope (closed knee), in 1979, it required an arthrotomy (open knee) "with extensive opening of the capsule on two sides * * * one of the most painful operations." The surgery, as performed in 1979, inex-

---

1. This court previously dismissed a fourth-party complaint against plaintiff's employer. *(Vargas v American Export Lines,* 107 AD2d 349 [1st Dept 1985].)

orably led to posttraumatic arthritis. Experts for both sides are in agreement that Vargas now has an "arthritic knee", that this is of a progressive degenerative nature, and, according to plaintiff's expert, may well require a total knee replacement.

Vargas' medical expert expressed the opinion that Vargas could never return to the work of a lasher, which is heavy, requires climbing, crouching and is of an intensive nature, which Vargas' right knee could simply not sustain. This opinion was not disputed by any other witness. Indeed, Vargas never returned to work as a lasher, nor was he ever able to do so. A few months after the accident, he purchased a truck for making deliveries of containers and hired a driver on a profit-sharing arrangement. In March 1980, Vargas himself began to drive the truck.

In November 1979, Vargas duly commenced the within action against AEL for personal injuries, alleging that the injury resulted from the negligence of the vessel in providing improper equipment. AEL impleaded the third-party defendant, Universal, which had been performing stevedore work on the vessel, claiming that the injury had in fact resulted from Universal's failure to properly supervise the work, and seeking indemnity in the event AEL was found liable to Vargas.

Following a trial, the jury awarded plaintiff damages totaling $875,261. Of this amount, (a) $220,000 was for lost earnings from September 10, 1977 to September 23, 1987; (b) $250,000 was for future lost earnings; (c) $235,000 was for pain and suffering to date (through Sept. 23, 1987); (d) $165,000 was for permanency, i.e., future pain and suffering; and (e) $5,261 was for stipulated medical expenses. In addition, as to liability, the jury apportioned AEL 90% liable, Universal 10% liable and Vargas not liable at all.

Following a flurry of posttrial motion practice, the IAS court rendered a decision on February 18, 1988 which, *inter alia,* held that "there is no basis at all for the $250,000.00 award for future lost earnings", granted AEL's cross motion for an order discounting the future damages award for pain and suffering from $165,000 to $120,000, and denied Universal's motion to dismiss the third-party complaint while upholding the apportionment of liability as between AEL and Universal. Thus, Vargas' total award was reduced to $580,261. Thereafter, Universal moved for renewal and reargument of its earlier motion. By decision dated March 14, 1988, the IAS court granted Universal's motion to the extent of, *inter alia,*

"set[ting] the judgment aside [sic]² against [Universal]." The IAS court stated that "it appears that in spite of the jury's determination to the contrary, there was no causal relationship between any acts of negligence on the part of Jimmy Romano [Universal's foreman] and the actual snapping back of the tensioner. The latter act is what caused the accident."

By order filed June 28, 1988, the court, *inter alia,* entered a judgment in favor of Vargas in the amount of $580,261 and dismissed "on the merits" the third-party complaint of AEL against Universal.

AEL appeals from the judgment, save those portions which set aside the jury's $250,000 award for future lost earnings and discounted the jury's future damages for pain and suffering award. Vargas appeals from those portions of the judgment. We now modify, to the extent of reinstating the jury verdict, restoring the $250,000 award for future lost earnings, restoring the award for future pain and suffering to $165,000, and reinstating the third-party complaint and the jury apportionment of liability.

First, in restoring the verdict as to future lost earning capacity, Vargas presented a wealth of evidence to support the verdict. Unquestionably, because of the severity of his injuries, Vargas could never return to work as a lasher. The evidence demonstrates that this 39-year-old man worked some 3,000 straight-time hours in the 52-week period preceding his injury. It appears that Vargas is a man of ambition, energy and diligence. We also note that in the three years prior to the trial, Jose Roco, Vargas' brother-in-law, earned, as a lasher, an average of $50,000 per year, substantially more than Vargas. Upon our review of the record, we must therefore disagree with the IAS court that Vargas' income in the future would likely exceed that of his potential income as a lasher. Thus, the IAS court's conclusion that there was no basis for the $250,000 future lost earnings award was erroneous. *(Cohen v Hallmark Cards,* 45 NY2d 493, 499 [1978] [holding that "[i]t is necessary to first conclude that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial."].)

We are also of the view that the court erred when it reduced the jury's future pain and suffering award, in the amount of $165,000, by discounting it to reflect a "present value" of $120,000. A reading of the jury instructions indi-

---

2. The judgment had yet to be entered at that time.

cates that the jury was instructed to consider the present value of future damages, regardless of the court's supplemental instruction that the jury did not have to calculate a discount rate.

However, AEL correctly contends that the IAS court erred when it granted Universal judgment dismissing the third-party complaint "in spite of the jury's determination to the contrary." AEL claimed that Jimmy Romano, Universal's foreman, rushed the lashers, thereby creating a dangerous work atmosphere. The jury verdict, which found Universal to be 10% liable, indicates that the jury was in agreement with AEL insofar as this aspect of the case was concerned. We therefore hold that the third-party complaint against Universal was improperly dismissed, and reverse that part of the order appealed from and, further, grant AEL's motion to amend the third-party complaint to seek contribution and apportionment of fault *(see, Dampskibsselskabet Torm v Thomas Paper Co., 26 AD2d 347, 352 [1st Dept 1966])*, and enter a judgment on the third-party complaint for 10% liability against Universal.

Accordingly, we modify to the extent indicated above and otherwise affirm. Concur—Kupferman, J. P., Ross, Carro and Rosenberger, JJ.